IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SUNSHINE HAVEN NURSING OPERATIONS,
LLC, d/b/a SUNSHINE HAVEN LORDSBURG,

Petitioner,

v.                                                                        No. 2:14-CV-00164-KG-CG

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, CENTERS FOR
MEDICARE & MEDICAID SERVICES,

Respondent.


MEMORANDUM OPINION AND ORDER

Sunshine Haven Nursing Operations, LLC, d/b/a Sunshine Haven Lordsburg

("Sunshine"), a skilled nursing facility ("SNF"), appeals the Centers for Medicare and Medicaid

Services' ("CMS") imposition of remedies for noncompliance with federal regulations.  On April

12 and 13, 2010, an Administrative Law Judge ("ALJ") held a hearing on Sunshine's initial

appeal of the CMS decision.  (Administrative Record ("AR") 3).  On August 5, 2011, the ALJ

determined that Sunshine was not in substantial compliance with Medicare program participation

requirements from November 5, 2008, to May 6, 2009, and upheld remedies, including Civil

Monetary Penalties ("CMP"), ineligibility to conduct a nurse aid training and competency

evaluation program ("NATCEP") for two years, Denial of Payment for New Admissions

("DPNA"), and termination of Sunshine's provider agreement with CMS.  (AR 52).  Sunshine

filed an appeal of the ALJ's decision with the United States Department of Health and Human

Services ("HHS") Departmental Appeals Board ("DAB"), which affirmed the ALJ's decision on

April 23, 2012.  (AR 53-82).  Sunshine sought review of the DAB's decision by filing a Petition

for Review of Agency Decision ("Petition") with the Tenth Circuit Court of Appeals on June 20,

2012.  (Doc. 1) at 9.  On February 14, 2014, the Tenth Circuit issued a decision on the CMPs and

NATCEP, over which it had jurisdiction, and transferred the DPNA and termination of provider

agreement issues to the District Court.  (Doc. 2).  Those matters are presently before the Court.

For the reasons explained below, the Court (1) denies Sunshine's Petition as to the DPNA and

termination of provider agreement issues, (2) affirms the DAB's decision with respect to those

issues, and (3), therefore, dismisses the case with prejudice.

I.   *Standard of Review*

    As the Tenth Circuit summarized,

> [a]n SNF is eligible to enter into a "provider agreement" with CMS to participate in the
> Medicare program and receive reimbursements for providing covered services.  *See id.*
> [42 U.S.C.] § 1395cc(a), (b).  Federal law requires that "[a] skilled nursing facility must
> operate and provide services in compliance with all applicable Federal, State, and local
> laws and regulations ... and with accepted professional standards and principles which
> apply to professionals providing services in such a facility."  *Id.* § 1395i–3(d)(4)(A).
> "Substantial compliance" is "a level of compliance with the requirements of participation
> such that any identified deficiencies pose no greater risk to resident health or safety than
> the potential for causing minimal harm."  42 C.F.R. § 488.301 ¶ 19; *see also Shalala v.
> Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 7, 120 S.Ct. 1084, 146 L.Ed.2d 1
> (2000) (citing 42 U.S.C. § 1395i–3(h); 42 C.F.R. § 488.301).  By contrast,
> "[n]oncompliance means any deficiency that causes a facility to not be in substantial
> compliance."  42 C.F.R. § 488.301 ¶ 11.  A "deficiency" is a violation of a statutory or
> regulatory participation requirement.  *Id.* ¶ 3.

*Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs., Centers for*

*Medicare & Medicaid Servs.*, 742 F.3d 1239, 1244–45 (10th Cir. 2014).  A period of

noncompliance is measured from the date a survey[1] finds noncompliance until the date a facility

---

[1] "Compliance is verified through unannounced inspections, called 'surveys,' conducted on
behalf of CMS by state survey agencies (SAs).  *See, e.g.,* 42 U.S.C. §§ 1395i–3(g)(2)(A),
(g)(2)(E)(i), 1395aa(a)."  *Sunshine Haven Nursing Operations, LLC,* 742 F.3d at 1245.

reaches substantial compliance.  State Operations Manual ("SOM") § 7317.3.[2]  A facility found

to be substantially out of compliance on a Medicare participation requirement must submit a plan

of correction within ten days for approval by CMS or the SA.  42 C.F.R. § 488.402(d); N.M.

Admin. Code 7.1.8.12; SOM § 7304.4.  Furthermore, "[w]hile CMS has the burden of

production to establish a prima facie case of noncompliance with a regulation, once CMS has

met this burden, the provider has the ultimate burden of persuasion that it was in substantial

compliance with the regulation at issue."  *Windsor Place v. U.S. Dep't of Health & Human

Servs.*, 649 F.3d 293, 297 (5th Cir. 2011).  The preponderance of the evidence standard applies to

this burden of persuasion.  *Greenbrier Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human

Servs., Ctrs. for Medicare & Medicaid Servs.*, 686 F.3d 521, 529 (8th Cir. 2012); *see also

SunBridge Care & Rehab. for Pembroke v. Leavitt*, 340 F. App'x 929, 933 (4th Cir. 2009)

(discussing preponderance of the evidence burden on facility).

 "A decision of the Departmental Appeals Board constitutes a final agency action and is

subject to judicial review."  42 U.S.C. § 1395ff(f)(2)(A)(iv).  42 U.S.C. § 405(g) governs the

Court's review of the DAB's decision.  *Sternberg v. Secretary, Dept. of Health and Human

Services*, 299 F.3d 1201, 1205 (10th Cir. 2002).  Pursuant to Section 405(g), "[t]he court shall

have power to enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or without

---

[2] The SOM provides guidance regarding CMS's interpretation of applicable law, but it does not have the force of law.  *Cal Turner Extended Care Pavilion*, DAB 2030 (H.H.S. May 25, 2006) (citing *Beverly Health & Rehab. Servs. v. Thompson*, 223 F. Supp. 2d 73, 99-106 (D.C. Cir. 2002); *Aase Haugen Homes, Inc.*, DAB No. 2013, at 15 (2006)).

3

remanding the cause for a rehearing."[3]  In accordance with Section 405(g), the Court must

"review the [Secretary's] decision to determine whether the factual findings are supported by

substantial evidence in light of the entire record, and to determine whether the correct legal

standards were applied."  *Threet v. Barnhart*, 353 F.3d 1185, 1189 (10th Cir. 2003).  "Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.  It requires more than a scintilla, but less than a preponderance."  *Wall v. Astrue*, 561

F.3d 1048, 1052 (10th Cir. 2009) (quotation omitted).  "[A] reviewing court [must] defer to

agency factual findings if they are supported by substantial evidence."  *Yzaguirre v. Barnhart*, 58

F. App'x 460, 462 (10th Cir. 2003) (unpublished).

## II.  Background

### A.  Procedural History

In response to a complaint regarding a Sunshine resident, CMS contacted the New

Mexico Department of Health, the SA, in 2008 to conduct surveys of Sunshine.  *See* 42 C.F.R.

§§ 488.10, 488.300, 488.330(a).  The SA conducted surveys on November 5 and 19, 2008, as

well as on January 21, 2009, February 3 and 5, 2009, and April 2 and April 20, 2009.  During

each survey, the SA found that Sunshine was not in substantial compliance with Medicare

conditions of participation.

After conducting the November 5, 2008, survey, the SA sent Sunshine a letter dated

November 19, 2008, stating that "we are giving formal notice of imposition of statutory Denial

of Payment for New Admissions (DPNA) effective February 5, 2009."  (AR 1530).  A DPNA is

mandatory after three continuous months of noncompliance with Medicare program participation

---

[3] Where the Medicare Act applies, as here, "any reference [in Section 405(g)] to the
Commissioner of Social Security or the Social Security Administration [SSA] shall be
considered a reference to the Secretary or the Department of Health and Human Services,
respectively."  42 U.S.C. § 1395cc(h)(1)(A).

requirements.  42 C.F.R. § 488.471(b)(1).  The letter also stated that "we are recommending to the CMS Regional Office that your provider agreement be terminated on April 5, 2009, if correction has not been achieved prior to that date."  (AR 1530).  Termination of a provider agreement is required after six months of continuous noncompliance with Medicare program participation requirements.  42 C.F.R. §§ 488.412(a) and (d), 488.450(d), and 488.456(b).  After the November 5, 2008, survey, the SA sent another letter to Sunshine dated January 14, 2009, with identical language as in the November 19, 2008, letter.  (AR 1170).

As a result of finding Sunshine out of substantial compliance for three continuous months and as result of the February 3, 2009, survey, the SA sent a letter to Sunshine on March 10, 2009, confirming a DPNA, effective February 5, 2009, and reiterating that termination of the provider agreement would occur on April 5, 2009, if Sunshine did not achieve substantial compliance. (AR 1204-07); *see* 42 U.S.C. § 1395i-3(h)(2)(B)(i), (h)(2)(D).  In a March 16, 2009 letter, CMS again confirmed the imposition of a DPNA, effective February 5, 2009, and termination of the provider agreement by April 5, 2009, if Sunshine did not achieve substantial compliance.  (AR 1514-27).  CMS subsequently extended the time it would terminate the provider agreement to May 6, 2009, via a letter sent to Sunshine on April 21, 2009.  (AR 1519).  Later, a May 28, 2009, letter from CMS to Sunshine indicated that CMS, in fact, terminated Sunshine's Medicare provider agreement on May 6, 2009, based on a finding that Sunshine was out of substantial compliance for six continuous months.  (AR 1037-39, 1519); *see* 42 U.S.C. § 1395i-3(h)(2)(C).

B.  *The Relevant Surveys*

1.  *The November 5, 2008, Survey*

On November 5, 2008, SA Surveyor Jennifer Wadley conducted a survey of Sunshine in response to a complaint by a mother that her daughter and other residents were not receiving

required baths.  (AR App. C at 57:24-58:1).  While Wadley does not have a medical background, she has a criminal justice background and holds the surveyor minimum qualifications test ("SMQT") certification.  (AR App. C at 56:1-4, 22-25; 57:1-4).  Wadley concluded that Sunshine failed to comply with 42 C.F.R. § 483.25(a)(3), which requires that a facility "ensure that [a] resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene."  Wadley based her conclusion on a review of Sunshine's bathing policy and procedure, Sunshine's charting policy and procedure, shower schedules, bath and shower forms, a facility abbreviation list, and care plans and records for three Sunshine residents.  (AR 1585-97).

Sunshine's bathing policy required that residents receive a shower or bath "at least two times a week and prn [as needed]."  (AR 1583).  The policy also required Sunshine staff to "[d]ocument the date of the shower and any abnormalities noted" as well as to "[r]eport skin changes to nurse."  (AR 1584).

Two residents, referred to as R1 and R3 for confidentiality purposes,[4] completely depended on Sunshine staff to perform activities of daily living, including keeping themselves clean, neat, and free of body odors.  R1's care plan provided that she be bathed two times per week or more as desired.  (AR 1544).  However, for thirteen days, from October 15, 2008, to October 27, 2008, there was no indication that R1 received any baths or showers.  (AR 1548-50; AR App. C at 96-101).  R3's care plan provided that he receive a bath or shower two to three times weekly or more as desired.  (AR 1569).  During the sixteen days from October 16, 2008, through October 31, 2008, there was no evidence that R3 received a bath or shower other than on October 21, 2008.  (AR 1581, AR App. C at 105-09).

---

[4] Other residents will, likewise, be referred to as "R."

Wadley testified before the ALJ that Sunshine's failure to bathe R1 and R3, as required, created the potential for more than minimal harm to the residents based on risk of infection, skin breakdown, and harm to psychosocial well-being. (AR App. C at 63:1-13). However, Wadley agreed that her surveyor notes did not indicate that the residents appeared unkempt, not bathed for long periods of time, or that any negative psychosocial symptoms arose from the infrequent bathing. (*Id.* at 109:11-18).

As a result of Wadley's survey, Sunshine properly submitted a plan of correction that identified a December 5, 2008, completion date. (AR 1535-38). A letter from the SA dated January 8, 2009, indicates that Sunshine addressed the deficiencies noted in the November 5, 2008, survey as of December 16, 2008. (AR 1168; AR App. C at 111:2-22; 112:9-13, 21-25; 113:1-25).

### 2.  *The November 19, 2008, Survey*

On November 19, 2008, the SA completed a second complaint survey of Sunshine, which found that the facility failed to evaluate and monitor the use of physical restraints[5] for two residents identified as R1 and R5. (AR 1609). The SA determined that Sunshine violated 42 U.S.C. § 1395-3(c)(1)(A)(ii) as well as 42 C.F.R. § 483.13(a), which states that "[t]he resident has the right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms."

Sunshine's restraint policy required the following where a restraint is necessary and not the result of unmet needs or staff convenience: 1) orders from the physician regarding the type, reason, and timeframe for the restraint device; 2) documentation in the medical record of the

---

[5]A physical restraint includes, for example, side rails, lap trays, devices used in conjunction with a chair to limit movement, and soft ties or vests. *Centers for Medicare & Medicaid Services State Operations Manual Rev. 55 (SOM)* at App. PP, F272 (Dec. 2, 2009).

interdisciplinary team's decision to use a restraint; 3) documentation of the restraint device, reason for the restraint device, and the releasing procedure for the device; 4) maintenance of the restraint device to minimize risk of decline and to provide optimal strength and mobility of the resident; and 5) consent from the resident or responsible party to use the restraint device.  (AR 1983-84).  The facility must also obtain documentation from a physician every thirty days authorizing use of the restraint.  (*Id.* at 1984).

The surveyor found that, while Sunshine used a lap belt to restrain R5 in his wheelchair, Sunshine did not obtain a physician's order for that restraint device.  (AR 1904, 1906, 1918, 1922, 1928).  Further, the surveyor found that Sunshine violated its own policy and Medicare regulations in several ways by restraining R1 with bed rails and a lap belt:  (1) the original physician's order did not state the duration of the lap belt's use; (2) Sunshine did not seek a physician reauthorization every thirty days to use the restraints; (3) Sunshine did not obtain consent from R1 or a responsible party to use the restraints; and (4) Sunshine did not reassess R1's restraint needs after he received a new wheelchair.  (AR 1644-700).  R1 also sustained bruises and red marks in October 2008 as a result of being trapped in the side bed rails or between the bed rails and an air mattress.  (AR 1649, 1675, 1678, 1694, 1698).

Sunshine apparently submitted two plans of correction for the November 19, 2008, survey:  one plan of correction, dated January 28, 2009, had a completion date of February 19, 2009; and another plan of correction, dated February 5, 2009, had a completion date of December 19, 2008.  (AR 24 n. 13, 1609-1640).  Notwithstanding the differing completion dates, the SA contacted Sunshine via letter on March 5, 2009, regarding the November 19, 2008, survey and stated, "Your facility was found to be in compliance with the Standards of

Participation based on the health revisit conducted on January 31, 2009.  Note: This notice of clearance is limited only to the survey mentioned above."[6]  (AR 1195).

### 3. The January 21, 2009, Survey

During a January 21, 2009, survey, the SA determined that Sunshine violated 42 C.F.R. § 483.25(h), which provides that "the facility must ensure that—(1) The resident environment remains as free of accident hazards as is possible; and (2) Each resident receives adequate supervision and assistance devices to prevent accidents."  (AR 2003-10).  The SA found that Sunshine failed to ensure that a Certified Nursing Assistant ("CNA") used proper body transfer techniques, thereby causing R5 to experience pain and bruising.  (AR 2003-10).  Although Sunshine provided training on the Hoyer lift and two-person transfers, that training focused only on repositioning in a chair, repositioning in a bed, and transferring from a bed to a stretcher.  (Id. at 2048).  The training materials also indicated that an employee should ask for additional assistance even when using a Hoyer lift.  (Id.).

On September 27, 2008, after R5 complained of pain in her shoulder during a transfer, Sunshine updated R5's care plan to require transfer by a Hoyer lift or two persons, transfer training, and use of a gait belt.  (AR 2025-26).  One of the goals listed for R5's care was that R5 "will have no further injury related to transfer."  (AR 2026).  On November 26, 2008, a CNA documented a bruise on R5's left arm.  (AR 2016).  Assuming the bruise occurred during a transfer, Sunshine's fall committee discussed R5's bruising that same day.  (Id. at 2030).

---

[6] On March 13, 2009, the SA sent another letter to Sunshine, not mentioning the March 5, 2009, letter, stating that the January 31, 2009, revisit did not show substantial compliance with respect to the November 19, 2008, survey.  (AR 1196-98).  Because HHS presently accepts a January 31, 2009, compliance date for the November 19, 2008, survey, the Court need not address the March 13, 2009, letter.

On December 1, 2008, a CNA reported that R5 sustained a large bruise on her left arm when the arm became trapped next to the wheelchair side rail while she was sitting. (*Id.* at 2031). On December 2, 2008, Sunshine placed sheepskin padding over the left-hand side rail of the wheelchair. (*Id.*). Sunshine's physical therapist reevaluated R5 on December 4, 2008, advising that R5 be transferred by a Hoyer lift or two-person assist. (AR 2024). As of December 13, 2008, R5 had what Sunshine staff characterized as an "old bruise." (AR 2034). On December 23, 2008, nursing notes indicate that R5 should be considered for a Hoyer lift before staff become injured. (AR 2036). Bath and shower forms from December 29, 2008, and January 2, 2009, also indicate that R5 had bruises on her arms. (AR 2028).

The SA interviewed R5 during the January 21, 2009, survey, and R5 complained that she received bruises on her arms during Hoyer lifts and two-person transfers. (AR 2005). On that date, R5 had bruises on both arms. (AR 2004). R5 identified a specific CNA who hurt her and stated that the CNA ignored her complaints of pain and laughed at her. (*Id.*). Records of employee counseling indicate that on December 5, 2008, Sunshine ordered the CNA to attend neglect and abuse training. (AR 2017). However, as of January 21, 2009, Sunshine provided no documentation that the CNA attended the ordered training. (AR 2006). Sunshine's plan of correction identified a completion date of February 21, 2009. (AR 2005).

### 4. The February 3, 2009, Survey

On February 3, 2009, the SA conducted a survey to evaluate Sunshine's compliance with Life Safety Code ("LSC") requirements. (AR 2075). The SA found nine violations of 42 C.F.R. § 483.70(a), which requires that a facility "be designed, constructed, equipped, and maintained to protect the health and safety of residents, personnel and the public." The SA determined that Sunshine failed to have sufficient smoke detectors, sprinklers, audiovisual alert systems, and

fire-rated walls and ceilings in various parts of the facility.  (AR 2075-89).  Sunshine does not

dispute that it violated eight of the nine LSC findings of noncompliance.  (AR 32-33).  The

parties, however, dispute whether Sunshine substantially complied with LSC deficiencies known

as Tag K021, Tag K029, Tag K051, and Tag K056 prior to May 6, 2009, the date CMS

terminated the provider agreement.  (*Id.*).

      With respect to Tag K021, failure to locate initiator devices near smoke doors, Sunshine

obtained a contract on April 29, 2009, for the installation of such devices.  (AR 2078-79; AR

App. C 322:22-323:5).  Sunshine's administrator, Gregory Michael Whitaker, testified at the

hearing before the ALJ that David Watson, the LSC surveyor, told him that Sunshine would be

in substantial compliance as long as it had contracts for corrections that would place the facility

in compliance.  (AR App. C at 323:5-16).

      Regarding Tag K029, failure to afford one-hour fire-rated enclosures with one-hour fire-

rated tiles, Sunshine purchased tiles on April 27, 2009, received the tiles two weeks later, and

promptly installed them.  (AR 2080-81; AR App. C at 324:2-9, 15-17; 325:19-25; 326:1).

Whitaker testified at the ALJ hearing that the LSC surveyor told him that a receipt for the

purchase of the tiles would constitute substantial compliance.  (AR App. C at 324:10-14).

      As to Tag K051, failure to have smoke detectors and audio visual devices in certain

rooms and corridors at Sunshine, the facility obtained a contract on April 29, 2009, for the

installation of such detectors and devices.  (AR 2081-83; AR App. C at 327:23-25; 328:1).  The

contract required approval by both the SA and the State Fire Marshal.  (AR App. C at 328:5-13).

Whitaker testified at the ALJ hearing that Watson informed him that the contract itself would

constitute substantial compliance, because, considering Sunshine's rural location, it would take

more than a week for the appropriate approvals of the detectors and devices.  (*Id.* at 328:5-9).

With respect to Tag K056, failure to equip outdoor canopies with sprinkler protection, Sunshine secured an installation contract on April 27, 2009.  (AR 2084-85; AR App. C at 329). Whitaker testified at the ALJ hearing that Watson informed him that the execution of the contract constituted substantial compliance.  (AR App. C at 329:20-25; 330:1).

On April 29, 2009, Sunshine also contracted with a company to design, deploy, and service a fire safety system to comply with the survey and state and city codes.  (AR 1199). According to Sunshine, design and drawings of the fire safety system were not completed and submitted to the State Fire Marshal until October 2009.  (Doc. 15) at 26.

On March 10, 2009, the SA informed Sunshine that it was not in substantial compliance with respect to the February 3, 2009, survey[7] and that it recommended imposing a DPNA, effective February 5, 2009, and terminating the provider agreement, effective April 5, 2009, if Sunshine did not achieve substantial compliance by then.  (AR 1204).  Whitaker subsequently spoke with Watson about a revisit, but Watson's boss told him not to conduct a revisit.  (AR App. C at 332:6-14).  On May 28, 2009, CMS sent a letter to Sunshine noting LSC deficiencies and stating that the DPNA was effective February 5, 2009, and that the provider agreement terminated on May 6, 2009.

As of November 4, 2009, Sunshine still had not corrected two fire-related deficiencies from the February 3, 2009, survey, including the upgrade of the fire alarm system.  (AR 1199-1200).  Sunshine wrote a letter to the New Mexico Department of Health at that time requesting a ninety-day waiver of these deficiencies for purposes of re-licensure.  (*Id.*).  The facility expected to have the corrections completed by December 31, 2009.  (AR 1199).

---

[7] The March 10, 2009, letter incorrectly refers to a February 5, 2009, survey.

*III. Discussion*

Sunshine asserts that the DAB's determination that Sunshine was in continuous noncompliance from November 5, 2008, through May 6, 2009, is erroneous and unsupported by substantial evidence.  Sunshine contends that neither the statute nor regulations mandated the imposition of the DPNA on February 5, 2009, or the termination of Sunshine's Medicare provider agreement on May 6, 2009.

Specifically, Sunshine argues first that it was in substantial compliance with respect to the November 5, 2008, and on January 21, 2009, surveys.  Second, Sunshine argues that it was in substantial compliance prior to February 5, 2009, the date the DPNA became effective.  Third, Sunshine argues that the DAB improperly relied on the February 3, 2009, survey to support the six-month period of noncompliance which provided the basis for the termination of the provider agreement.  Fourth, Sunshine argues that it was in substantial compliance with respect to the LSC requirements on May 6, 2009, the date CMS terminated the provider agreement.  Fifth, Sunshine argues that CMS and the SA failed to comply with statutory and regulatory obligations, thereby, denying Sunshine due process.  Sunshine requests that this Court rescind the DPNA imposed on February 5, 2009, and reverse the DAB's decision to terminate Sunshine's provider agreement on May 6, 2009.

> *A.  Whether Sunshine was in Substantial Compliance with Respect to the November 5, 2008, Survey*

Sunshine argues that substantial evidence does not support a finding that it was not in substantial compliance with Medicare regulations on November 5, 2008.  Sunshine contends first that the DAB based its decision on incompetent medical opinion testimony from Wadley.  Specifically, Sunshine contends that because Wadley is not a medical professional and has no medical background, training, or experience, she may not opine as to whether fewer showers and

baths increases residents' risk of infection or psychosocial problems.  Sunshine argues that although Wadley had the required surveyor training, there was no evidence as to what training she might have received regarding increased risk of infection or psychosocial problems. Sunshine then claims that the ALJ improperly shifted the burden of proof to Sunshine to rebut Wadley's testimony.

Sunshine further argues that although the DAB assumes that a twice-weekly skin assessment is the purpose of bathing twice a week, bathing is not the only opportunity for skin assessment.  For example, assisting with dressing and toilet use also affords staff the opportunity to assess residents' skin.  Sunshine also contends that the purpose of Section 483.25(a)(3) is not to require a facility to conduct skin assessments.

Sunshine also points out that the lack of showers and baths did not result in a negative outcome or actual harm to residents.  Accordingly, Sunshine posits that there is no competent evidence that the two residents faced more than minimal harm as a result of a short-term departure from its bathing policy.

While Sunshine argues that there is no evidence that Wadley received competent medical training permitting her to find that R1 and R3 faced a risk of more than minimal harm, and that the ALJ improperly shifted the burden of proof to Sunshine to rebut Wadley's testimony, Sunshine holds the burden of persuasion in this case.  The Court finds that CMS established a *prima facie* case that Sunshine violated Section 483.25(a)(3) by failing to follow bath policy and care plans, thus shifting the burden of persuasion to Sunshine to show that it was in substantial compliance with Section 483.25(a)(3).  Sunshine has failed to carry that burden of persuasion.  In particular, Sunshine failed to prove by a preponderance of the evidence that the CMS training and SMQ test were insufficient to allow Wadley to competently conclude that a risk of more than

minimal harm existed for R1 and R3.  Rather, the DAB's decision is supported by substantial

evidence such as Wadley's testimony, testimony backed by the bath/shower plans that provide

for noting skin conditions, and by the fact that bathing provides a means of detecting medical

issues affecting the skin.  In fact, a bath alerted staff to bruising on a resident that served as the

basis for noncompliance on January 21, 2009.  (AR 59).  Therefore, substantial evidence

supports the DAB's decision to affirm the ALJ's finding that Sunshine was not in substantial

compliance on November 5, 2008, and that Sunshine corrected the deficiency by no later than

December 16, 2008.

   *B.  Whether Sunshine was in Substantial Compliance with Respect to the January 21,*
   *2009, Survey*

   Sunshine maintains that the DAB's findings with respect to the January 21, 2009, survey

are unsupported by substantial evidence, and that the DAB ignored steps Sunshine took to assess

the needs of R5 and to mitigate foreseeable risks of harm when transferring R5.  Sunshine argues

that the DAB improperly held it strictly liable for a CNA's failure to follow facility policy,

training, and R5's care plan, each of which identified appropriate care and transfer techniques for

R5.  Sunshine also contends that the Sunshine policy the DAB relies on does not direct or require

that two people transfer a resident using the Hoyer lift and that there was no confusion as to

whether a Hoyer lift could be used for R5's transfer, because the Hoyer lift was an option, along

with the two-person assist.  (Doc. 15) at 20 (citing AR 2048).  Sunshine further argues that the

DAB cited to assumptions and inferences rather than to actual facts in the record.  For example,

while the DAB questioned whether Sunshine provided training on transfers between a resident's

bed and a wheelchair or provided adequate training materials for using Hoyer lifts, Sunshine

claims that the training materials did include lift strategies and instructions on transferring a

resident from a bed to a wheelchair.  Additionally, Sunshine contends that R5's bruising was nothing other than an unavoidable accident.

Sunshine has not persuaded the Court by a preponderance of the evidence that it substantially complied with Section 485.25(h).  The Court notes that the Hoyer lift training packet provided by Sunshine only addresses repositioning in a chair, repositioning in a bed, and transferring from a bed to a stretcher.  (AR 2048).  There is no information about transferring from a bed to a chair or from a bed to a wheelchair, nor is there any information on how to operate a Hoyer lift and to avoid injuries to the resident.  (*Id.*).  Contrary to Sunshine's assertion, the training information does direct a staff person to ask one or more co-workers to assist when using a Hoyer lift.  (*Id.*).  Staff notes further indicate that there was confusion over a period of months regarding whether to use the Hoyer lift (*see* AR 2026, 2031, 2036).  Moreover, nothing in the record suggests that Sunshine staff considered placing sheepskin on the right arm of R5's wheelchair in addition to the left arm of the wheelchair.  Meanwhile, R5 suffered several bruises due to transfers over a several month period.  Upon a review of the record, the Court is hard-pressed to find that R5 simply suffered from "unavoidable" accidents.  The Court concludes that substantial evidence supports the DAB's conclusion that Sunshine was not in substantial compliance with 42 C.F.R. § 483.25(h) from January 21, 2009, through February 21, 2009.

*C. Whether Sunshine Returned to Full Substantial Compliance Prior to February 5, 2009*

While before the DAB, Sunshine did not specifically dispute the duration of noncompliance found by the ALJ, which the DAB affirmed.  (AR 64).  Sunshine, however, now argues that it was in substantial compliance prior to February 5, 2009, the date the DPNA became effective.  Sunshine states that following the November 19, 2008, survey, CMS only conducted a desk review of that survey on January 31, 2009.  (Doc. 15) at 23; (Doc. 18) at 7.

16

Sunshine asserts that the January 31, 2009, compliance date is, therefore, completely arbitrary and that CMS should have accepted Sunshine's December 19, 2008, plan of correction completion date.

Sunshine also argues that CMS should not have imposed the DPNA, because Sunshine received a March 5, 2009, letter from the SA stating that the November 19, 2008, deficiencies had been cleared based on a January 31, 2009, revisit, prior to February 5, 2009, the effective date for imposing the DPNA.  Hence, Sunshine contends that the subsequent March 10, 2009, notice stating that a DPNA had been imposed effective February 5, 2009, contradicts Sunshine's return to substantial compliance on January 31, 2009.

Moreover, Sunshine maintains that (1) the ALJ acknowledged that there were inconsistencies in communications from the SSA and CMS regarding whether the plan of correction would be complete by December 19, 2008, or February 19, 2009; (2) the ALJ observed that it was "not clear from the record" why those inconsistencies were present; and (3) the ALJ improperly shifted the burden of proof to Sunshine "to both challenge and prove the nature of such consistencies."  (Doc. 15) at 23 (quoting AR 24 n.13)).  Sunshine also argues that "construing inconsistencies created by the SSA and CMS against Petitioner and essentially requiring Petitioner to independently prove that the SSA's March 5 certification was correct hardly comports with fundamental notions of due process."  (*Id.*).

The facility has the burden to prove that it resumed substantial compliance prior to the date of revisit by the SA.  *Golden Living Ctr.-Frankfort v. Sec'y of Health & Human Servs.*, 656 F.3d 421, 429 (6th Cir. 2011) ("[T]he burden is upon the facility to prove it has resumed compliance . . . .").  The facility must provide documentation that it went back into compliance at the earlier date.  42 C.F.R. § 488.440(h); 42 C.F.R. § 488.454(e).  *See also Omni Manor Nursing*

*Home v. U.S. Dep't of Health & Human Servs.*, 512 F. App'x 543, 545 (6th Cir. 2013) ("The penalty generally accrues until the date on which a 'revisit' survey confirms that a facility has corrected all deficiencies.  The duration of the penalty may be reduced if a facility can demonstrate through 'written credible evidence' that it made the necessary corrections on a date prior to the revisit survey.").

This Court finds that substantial evidence supports a conclusion that the SA did not accept the December 19, 2008, completion of plan of correction date and, instead, adhered to a January 31, 2009, correction completion date.  The March 5, 2009, letter, in fact, expressly provides a correction completion date of January 31, 2009.  (AR 1195).  Sunshine has, thus, failed to provide documentation to prove that it achieved substantial compliance at the earlier December 19, 2008, date.

With regard to any inconsistencies between the March 5, 2009, and March 10, 2009, letters, HHS agrees that the March 5, 2009, letter cleared any deficiencies from the November 19, 2008, survey as of January 31, 2009.  Thus, Sunshine need not prove that the March 5, 2009, letter was indeed correct, and no problems with due process exist on that matter.  Nonetheless, the March 10, 2009, letter noting the imposition of the DPNA is consistent with the March 5, 2009, letter.  Although Sunshine cured its November 19, 2008, deficiencies by January 31, 2009, the SA found a new deficiency on January 21, 2009, that Sunshine did not cure until February 21, 2009, after the February 5, 2009, date for imposing the DPNA.  Finally, the inconsistency noted by the ALJ that Sunshine cites in its briefing deals with inconsistent plans of corrections submitted by Sunshine, not inconsistent statements by the SA or CMS.  (*See* AR 24 n.13).  Thus, this argument fails to assist Sunshine as well.  The Court concludes that, due to overlapping

periods of noncompliance, substantial evidence supports the DAB's determination that Sunshine did not return to substantial compliance by February 5, 2009.

   *D.  Whether the DAB Improperly Relied on Deficiencies in the February 3, 2009, Survey to Support a Finding of Continued Noncompliance*

   Sunshine also argues that the DAB improperly relied on the February 3, 2009, survey to support a continuous six-month period of noncompliance.  Sunshine specifically contends that "at no time prior to termination of Petitioner's provider agreement on May 6, 2009[,] did CMS notify Petitioner that CMS concurred in any finding of noncompliance made in the 2/3/09 LSC Survey.  It was not until May 2[8], 2009[,] that CMS for the first time notified Petitioner that it concurred in the SSA's findings of noncompliance made in the 2/3/09 LSC Survey."  (Doc. 15) at 24.  Sunshine, therefore, contends that the May 28, 2009, letter constituted improper *ex post facto* findings by CMS.  Further, Sunshine argues that the SA failed and refused to conduct a revisit prior to terminating the provider agreement and that this constituted a violation of due process.

   The Court recognizes that the March 16, 2009, letter from CMS does not discuss the February 3, 2009, LSC survey when it warned Sunshine that it could face termination of the provider agreement on April 5, 2009.  (*See* AR 1514-17).  Additionally, the April 21, 2009, letter from CMS extending the date for terminating the provider agreement does not discuss the February 3, 2009, survey.  (AR 1519).  Nonetheless, proper notice does not require that the notice of termination of the provider agreement be made by CMS itself; rather, the SA may provide the notice.  Pursuant to 42 C.F.R. § 488.402(f)(1), "CMS or the State (as authorized by CMS) gives the provider notice of the remedy, including the—(i) Nature of the noncompliance; (ii) Which remedy is imposed; (iii) Effective date of the remedy; and (iv) Right to appeal the

determination leading to the remedy." The SA's March 10, 2009, letter to Sunshine notified Sunshine that it was not in substantial compliance with the LSC deficiencies identified in the February 3, 2009, survey[8] and that termination of the provider agreement would occur as of April 5, 2009, if Sunshine did not achieve substantial compliance. (AR 1204-07). Therefore, the Court concludes that Sunshine received notice that the LSC deficiencies constituted part of the six continuous months during which Sunshine was out of substantial compliance.

With regard to a revisit prior to termination of the provider agreement, "the regulations and the SOM itself make clear that whether and when revisit surveys are performed is in the discretion of the State and CMS, not the facility." *Cal Turner Extended Care Pavilion*, DAB 2030 (H.H.S. May 25, 2006) (citing 42 C.F.R. § 488.308(c); SOM, § 7207B; SOM 7317.2(2) ("A facility is not entitled to any revisits; revisits are performed in accordance with guidelines provided in this section and at the discretion of CMS or the State."). Even if the SA or CMS were required to conduct a revisit prior to termination of the provider agreement on May 6, 2009, the fact that Sunshine still had not corrected all deficiencies from the February 3, 2009, survey as of November 4, 2009, well past the May 6, 2009, deadline to come into substantial compliance, indicates that any failure to revisit the facility prior to May 6, 2009, constituted harmless error. (*See* AR 1199-1200). In sum, substantial evidence supports the DAB's decision that the February 3, 2009, survey provided a portion of the six-month noncompliance period.

---

[8] Although the March 10, 2009, letter incorrectly states that the LSC survey took place on February 5, 2009, rather than on February 3, 2009, the Court considers this error to be harmless for purposes of notice in that the letter accurately reiterates that the provider agreement would terminate on April 5, 2009, in the absence of substantial compliance.

*E.  Whether Substantial Evidence Supports the DAB's Conclusion that Sunshine was not in Substantial Compliance with LSC Requirements on May 6, 2009*

Next, Sunshine contends that the DAB did not support with substantial evidence its conclusion that Sunshine was not in substantial compliance with the LSC deficiencies on May 6, 2009, the date CMS terminated the provider agreement.  Sunshine argues that, given the significant amount of work and approvals needed to implement the LSC plan of correction, Sunshine could reasonably rely on the surveyor's statements that having a contract in place for the corrections constituted substantial compliance.  Sunshine contends that it would not be reasonable for the SA or CMS to require completion of the work by May 6, 2009, as these agencies knew that the work would require months of design, development, and procurement of approvals.

The Court observes that "[a]pproving a [plan of correction] as an acceptable statement of how the facility will address the findings is not tantamount to determining that the POC [or plan of correction] has been successfully implemented and substantial compliance achieved."  *Cal Turner Extended Care Pavilion*, DAB 2030 (H.H.S. May 25, 2006) (citing *Beverly Health & Rehab. Servs.*, DAB No. 1696, at 19 (1999), *aff'd*, Beverly *Health & Rehab. Servs. v. Thompson*, 223 F. Supp. 2d 73, 99-106 (D.C. Cir. 2002)).  "[A petitioner] may well have been informed by someone from the State survey agency that the POC was accepted.  That information, however, does not affect CMS's authority to impose a [remedy] for the period when [petitioner] was not in substantial compliance."  *Id.*

Following the above law, the approval of the plan of correction in this instance did not constitute substantial compliance.  In addition, given the mandatory nature of the regulations and Sunshine's noncompliance with respect to the LSC deficiencies for over a six-month period, CMS did not err in deciding to terminate the provider agreement.  Therefore, the Court

concludes that the DAB's conclusion that Sunshine was not in substantial compliance with LSC

requirements was not erroneous and was supported by substantial evidence.

   *F. Whether CMS's Failure to Comply with Certain Statutory and Regulatory Obligations
   Denied Due Process to Sunshine*

   Sunshine reiterates that CMS's failure to comply with statutory and regulatory

obligations violated its due process rights.[9]  Sunshine contends that the Court should reverse the

termination of the provider agreement, because CMS and the SA never provided notice to the

public of the termination of Sunshine's provider agreement nor did they arrange for the safe and

orderly transfer of Medicare residents out of the terminated facility, as required by regulation.

Sunshine also argues that CMS only provided retroactive notice of imposition of the DPNA,

effective February 5, 2009.

   Pursuant to 42 C.F.R. § 488.456(c), "Before terminating a provider agreement, CMS does

and the State must notify the facility and the public-- . . . ."  However, "nothing in 42 C.F.R. §

488.456 suggests that failure to comply strictly with the publication requirements would be a

basis for invalidating the termination.  The publication requirement is not a prerequisite for

implementing a termination."  *Beechwood Sanitarium*, DAB No. 1824 (2002).  Under 42 C.F.R.

§ 488.426(b), Furthermore, "[w]hen the State or CMS terminates a facility's provider agreement,

the State will arrange for the safe and orderly transfer of all Medicare and Medicaid residents to

another facility . . . ."  As in Section 488.456(c), nothing in Section 488.426(b) suggests that the

failure to transfer residents in a safe and orderly manner constitutes a basis for invalidating the

termination of the provider agreement.

   The Court agrees with HHS's contention that the DAB correctly determined that the

regulations regarding notice to the public and the transfer of residents do not provide a basis to

---

[9] This section discusses those due process matters not previously addressed in this opinion.

invalidate a termination of a provider agreement.  The Court further agrees with HHS's argument that Sunshine's retroactive notice argument is disingenuous, because the SA notified Sunshine in letters dated November 19, 2008, and January 14, 2009, that the DPNA would be imposed on February 5, 2009.  Consequently, CMS did not violate Sunshine's right to due process based on inadequate notification of the termination of the provider agreement or imposition of the DPNA.

*IV. Conclusion*

Sunshine has not persuaded the Court by a preponderance of the evidence that it was in continuous substantial compliance from November 5, 2008, to May 6, 2009.  Consequently, the DAB did not commit legal error, and substantial evidence supports the DAB's decision. Accordingly, the Court denies Sunshine's Petition as it relates to the DPNA and termination of the provider agreement, affirms the DAB's decision with respect to the conclusions on the DPNA and termination of the provider agreement, and will dismiss this case with prejudice.

IT IS ORDERED that

1.  Petition for Review of Agency Decision (Doc. 1) at 9 is denied as it relates to the DPNA and termination of the provider agreement;

2.  the DAB's April 23, 2012, decision is affirmed with respect to the conclusions on the DPNA and termination of the provider agreement; and

3.  this matter will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

23